UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| C.J.P.,<br><br>     Plaintiff,<br><br><br>  vs.<br><br>KILOLO KIJAKAZI,<br>Acting Commissioner of Social Security<br>Administration,<br><br>     Defendant. | 4:22-CV-04106-VLD<br><br><br><br>MEMORANDUM OPINION<br>AND ORDER |

**INTRODUCTION**

C.J.P. seeks judicial review of the Commissioner's final decision denying his application for social security disability benefits under Title II of the Social Security Act. Docket No. 1, ¶¶ 1–2. Mr. P. prays for either reversal of the Commissioner's decision, or for this court to remand the proceedings for further hearing.[1] Docket No. 1, ¶ 7.1. Mr. P. also seeks an award of attorney's fees, pursuant to 28 U.S.C. § 2412(d), "on the grounds that the Commissioner's action in this case was not substantially justified." Id., ¶ 7.4.

---

[1] Plaintiff's Brief "requests that the *Appeals Council* reverse the Decision of the ALJ and order that Mr. P. be awarded his disability benefits for the onset date of June 30, 2019." Docket No. 17 at p. 10 (emphasis added). The court interprets this text as praying for the relief requested in Docket No. 1.

Mr. P.'s appeal is properly before this court pursuant to 42 U.S.C. § 405(g), and the parties have consented to this magistrate judge overseeing the matter, pursuant to 28 U.S.C. § 636(c).  Docket No. 20.

## MEDICAL EVIDENCE CHRONOLOGY

### I.  March 2018.

On March 8, 2018, Mr. P. was working on a project to set up air handlers at a new orthopedic center in Rapid City, South Dakota.  AR46.[2]  While maneuvering a curb into position, Mr. P. leaned on a piece of plywood, which gave way.  AR46–47.  The plywood was covering a hole in the building's roof.  AR363.  So, as a result of its breach, Mr. P. fell twenty feet headfirst to the concrete floor below.  AR47, 383.  Eyewitnesses observed Mr. P. land "on his left shoulder and the left side of his head."  AR360.  Mr. P. was wearing a construction hardhat.  AR363.  Upon contact with the floor below, Mr. P. lost consciousness for 1-2 minutes.  AR47, 363.  When he came to, his co-workers held him down until the paramedics arrived.  AR47.  When the paramedics arrived, they "strapped [Mr. P.] to a board and carried [him] down the rest of [the] stairs," and he was transported by ambulance to Rapid City Hospital.  Id.; AR369.

Upon arrival at Rapid City Hospital, Mr. P. was first "seen by Dr. Smith in the emergency room, and after his initial evaluation, a trauma alert was activated."  AR360.  Mr. P. was next examined by Dr. Patrick Kenney, a general

---

[2] Citations to the appeal record will be cited as "AR" followed by the page or pages.

surgeon.  Id.  Mr. P.'s "major complaint" to Dr. Kenney "was of pain in his right hip and pain in his head."  Id.

Dr. Kenney's examination noted "a cephalohematoma[3] present across the forehead" and "a laceration on the lateral aspect of the left nares[4] internally." AR361.  Mr. P.'s CT scans showed "closed fractures with a small amount of pneumocephaly[5] present along the left parietal region."[6]  Id.  Dr. Kinney also noted "a left lateral orbital wall[7] fracture [that] extend[ed] near the skull base," as well as the "presence of an anterior acetabular fracture[8] on the right." AR362.  Dr. Kinney considered Mr. P. as having a "significant closed head

---

[3] "A cephalohematoma is an accumulation of blood under the scalp." NAT'L LIBR. OF MED., https://www.ncbi.nlm.nih.gov/books/NBK470192/#:~:text=A%20cephalohematoma%20is%20an%20accumulation,subsequent%20rupture%20of%20blood%20vessels (last visited Sep. 13, 2023).

[4] This is part of the nose.  NAT'L HUM. GENOME RES. INST., https://elementsofmorphology.nih.gov/anatomy-nose.shtml (last visited Sep. 14, 2023).

[5] A "pneumocephalus" is "the presence of intracranial air."  It "is a complication especially seen after neurotrauma or brain surgery."  Zora Gorissen et al., *Pneumocephalus: a rare and life-threatening, but reversible, complication after penetrating lumbar injury*, NAT'L LIBR. OF MED. (Jan. 17, 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6373275/.

[6] The parietal lobe is part of the brain.  See United States v. Montgomery, 635 F.3d 1074, 1092 (8th Cir. 2011).

[7] The "orbit" is the eye socket.  Kierstan Boyd, *What is an Orbital Fracture?*, AM. ACAD. OF OPHTHALMOLOGY (Sep. 28, 2017), https://www.aao.org/eye-health/diseases/what-is-orbital-fracture#:~:text=An%20orbital%20fracture%20is%20when,hits%20the%20eye%20very%20hard.

[8] The "acetabulum" is part of the pelvis.  It is the socket part of the hip—which is a "ball-and-socket" joint.  *Acetabular Fractures*, ORTHOINFO (from the Am. Acad. of Orthopaedic Surgeons), https://orthoinfo.aaos.org/en/diseases--conditions/acetabular-fractures/ (last visited Sep. 14, 2023).

injury." Id.  For this reason, Mr. P. was "admitted overnight for observation."
Id.

On the morning of March 9, Mr. P. was examined by Dr. Stig Peitersen, a
neurosurgeon.  AR363.  Dr. Pietersen's report includes mention of facial
fractures and a fracture of the right first rib.  AR363.  Dr. Pietersen confirmed
the existence of cranial fractures, "including bilateral frontal fractures as well
as left temporal and left parietal fractures as well as left lateral orbital fracture
and left supraorbital fracture."  AR365.  Dr. Pietersen also noted that Mr. P.
suffered from "mild tenderness in the right wrist area."[9]  Dr. Pietersen did not
believe that Mr. P.'s cranial fractures required "neurosurgical intervention."  Id.

Mr. P.'s x-ray findings noted "a very small left frontal epidural
hematoma[10] having no significant effect on the underlying brain," as well as
"[e]xtensive scalp swelling."  AR423.

Mr. P. was discharged from Rapid City Hospital on March 12.  AR369.
Mr. P.'s discharge report stated that "[a]ll injuries were determined non-
operative but [Mr. P.] was placed on weight bearing restrictions."  Id.  Dr. Troy
Howard, an otolaryngologist, recommended "no nose blowing [for two weeks],
no lifting more than 10lb, sneeze/coughing with mouth open only."  AR382,

---

[9] Mr. P. is right-handed.  AR47.

[10] "An epidural hematoma (EDH) occurs when blood accumulates between the
skull and the dura matter, the thick membrane covering the brain."  *Epidural
Hematoma*, UCLA HEALTH, https://www.uclahealth.org/medical-services/
neurosurgery/conditions-treated/epidural-hematomas#:~:text=An%
20epidural%20hematoma%20(EDH)%20occurs,usually%20occur%20in%20you
ng%20adults (last visited Sep. 15, 2023).

405.  In regard to Mr. P.'s pelvic fracture, Dr. Ulises Militano, an orthopedic surgeon, ordered Mr. P. to remain non-weight bearing on his right lower extremity for 8-12 weeks.  Id.  To that end, Mr. P. was provided crutches. AR507.

On March 21, Mr. P. visited Dr. Bryan Hammer, an ophthalmologist in Sioux Falls.  AR410.  At this time, Mr. P. complained of a pain level of 4 and a "[m]ild intermittent headache."  Id.  Dr. Hammer's impressions were that Mr. P. presented: "(1) Contusion of eyeball and orbital tissues, left eye, initial encounter, (2) Closed fracture of left orbit, and (3) Subconjunctival hemorrhage[11] of left eye."  AR411.  It was Dr. Hammer's opinion that Mr. P. "[s]hould have no long term eye issues."  AR412.

On March 27, Mr. P. was evaluated by Dr. Melissa Moutray, an oral surgeon in Sioux Falls.  AR415–16.  Mr. P. reported "some deviation of his jaw with opening and closing and some tenderness to his left face."  AR428.  Dr. Moutray noted "some mild facial swelling on the left."  Id.  Upon consulting Mr. P.'s x-ray, she "felt no surgery was needed."  AR415.  Dr. Moutray considered Mr. P.'s facial fractures to be "healing within normal limits."  AR428.  Mr. P. was restricted as to contact to his face for three weeks and was placed on a "soft chew diet."  Id.

---

[11] A "subconjunctival hemorrhage is when one or more blood spots appear on the white of [the] eye."  Kierstan Boyd, *What is a Subconjunctival Hemorrhage?*, AM. ACAD. OF OPHTHALMOLOGY (May 1, 2023), https://www.aao.org/eye-health/diseases/what-is-subconjunctival-hemorrhage.

On March 29, Mr. P.'s head injury was evaluated by Dr. Thomas Ripperda of Avera Medical Group in Sioux Falls on behalf of Mr. P.'s workers' compensation carrier.  AR597–98.  Dr. Ripperda noted traumatic brain injury, a "[s]mall epidural hematoma in the left frontal location," a "right acetabular fracture," and "postconcussive syndrome[12] with subsequent dizziness, mood lability,[13] and memory difficulties."  AR598.  Dr. Ripperda "anticipate[d] that Mr. P. [would] continue to demonstrate steady overall improvements."  Id.  He noted that Mr. P. felt "that he [was] improving daily."  Id.  "Mr. P.'s MOCA[14] score [was] a 26, which put him just at the lower limits of normal."  Id.

## II.   April 2018.

On April 2, Mr. P. underwent an MRI of his brain at Avera Queen of Peace Hospital in Mitchell, South Dakota.  AR586.  Dr. Matthew T. Pardy's impression stated the results were normal.  Id.

On the same day and at the same hospital, Mr. P. underwent an ultrasound of his abdomen, "focusing on the liver."  AR594.  Dr. Tamara

---

[12] "Post-concussion syndrome refers to the unique set of persistent symptoms experienced by any one person after a concussion."  Kristina M. Gerardi, *Tackles that Rattle the Brain*, 18 Sports L.J. 181, 185 (2011) (quotation omitted).

[13] "Emotional lability" represents "[r]apid and extreme changes in mood, often with uncontrollable laughing or crying, low tolerance for frustration, and emotional responses that are inappropriate or disproportionate for the particular situation."  *Emotional lability*, Attorney's Dictionary of Medicine (Release No. 56 2022).

[14] The "Montreal Cognitive Assessment (MoCA)" is a "test to assess cognitive impairments."  Anderson v. Berryhill, 368 F. Supp. 3d 128, 131 (D. Mass. 2019) (internal quotation marks omitted).

Wheeler noted a "[f]airly coarse liver echotexture[15] with increased echogenicity[16] probably due to fatty change." Id.

On April 3, Mr. P. underwent a CT scan of his head at Avera McKennan Hospital in Sioux Falls, conducted by Dr. Daniel Crosby. AR451. Dr. Crosby noted multiple, stable skull fractures, but no "intracranial hemorrhage, contusion or mass effect." AR452.

On April 4, Mr. P. underwent surgery at Avera McKennan Hospital to correct (what turned out to be) a wrist fracture. AR447, 601. During the surgery, Dr. Emran Sheikh inserted a 20mm screw into Mr. P.'s right scaphoid.[17] AR447, 472. Dr. Sheikh noted "satisfactory placement of the hardware as well as stable fracture compression and reduction was noted with gentle range of motion." AR447. A reviewing radiologist, Dr. Patrick Nelson, found that the screw's position "appear[ed] good," and that the "orthopedic fixation of [the] scaphoid fracture [was] in satisfactory position." AR449.

On April 8, Mr. P. was evaluated by speech language pathologist, Dr. Patricia Larson Shields of Dakota Physical Therapy in Mitchell, where he was

---

[15] "Echotexture" is "[t]he characteristic pattern or structure of tissue layers as seen during ultrasonic imaging." *Echotexture*, Medical Dictionary (Farlex and Partners 2009), https://medical-dictionary.thefreedictionary.com/echotexture.

[16] "Echogenicity" is "[t]he ability of a structure to reflect high frequency sound waves." *Echogenicity*, Attorney's Dictionary of Medicine (Release No. 56 2022).

[17] "The scaphoid bone is one of the carpal bones on the thumb side of the wrist. The bone is important for both motion and stability of the wrist joint." *Scaphoid Fracture of the Wrist*, ORTHOINFO (from the Am. Acad. of Orthopaedic Surgeons), https://orthoinfo. aaos.org/en/diseases--conditions/scaphoid-fracture-of-the-wrist/#:~:text= The%20scaphoid%20bone%20is%20one, relatively%20long%20and%20curved%20shape (last visited Sep. 15, 2023).

diagnosed with post-concussion syndrome.  AR539.  According to the results of Mr. P.'s Cognitive Linguistic Quick Test,[18] Mr. P. exhibited mild weakness in clock drawing, attention, memory, and visuospatial skills.[19]  Id.  Dr. Larson Shields drafted a treatment plan with the goal of "retain[ing] and recall[ing] detailed information over 3 therapy sessions."  Id.

On April 10, Mr. P. returned to Dr. Larson Shields where he exhibited 80% accuracy with his attention exercises ("with cues at the minimal verbal assistance level") and 70% accuracy with his memory tasks.  AR541.  Dr. Larson Shields noted progress.  Id.

On April 11, Mr. P. underwent an MRI of his shoulder at Avera Queen of Peace Hospital.  AR592.  Dr. Carey Buhler noted a "potential strain injury. . . . [m]ild fluid in the subacromial bursa suggesting posttraumatic bursitis,"[20] and potential impingement.[21]  Id.

---

[18] A "Cognitive Linguistic Quick Test" assesses "five primary cognitive domains, including attention, executive function, memory, language, and visuospatial skills."  Aviles-Guzman v. Comm'r of Soc. Sec., No. 19-CV-5043 (PKC), 2021 WL 663979, at *6 (E.D.N.Y. Feb. 18, 2021) (quotation omitted).

[19] "Visual-spatial ability [is] the ability to comprehend and conceptualize visual representations and spatial relationships in learning and in the performance of tasks such as reading maps, navigating mazes, conceptualizing objects in space from different perspectives, and executing various geometric operations." Visual-spatial ability, APA Dictionary of Psychology, https://dictionary.apa.org/ visual-spatial-ability (last visited Sep. 21, 2023).

[20] "Bursitis" is the "[i]nflammation of a bursa. . . . [A] bursa is a sac filled with fluid and placed between moving surfaces that would otherwise rub against each other."  Bursitis, Attorney's Dictionary of Medicine (Release No. 56 2022).

[21] "Shoulder impingement occurs when the top outer edge of your shoulder blade rubs against or pinches your rotator cuff beneath it, causing pain and irritation."  David v. Saul, No. 4:19-CV-02142, 2021 WL 2673198, at *4 n.9

On April 15, Mr. P. returned to Dr. Larson Shields where he exhibited 80% accuracy with his memory exercises.  Id.  Mr. P. noted "not feeling as though he had that big of [a] problem until someone pushe[d] him to recall or inform[ed] him of his difficulties."  Id.  Dr. Larson Shields observed that Mr. P. "appear[ed] to be frustrated."[22]  Id.

On April 16, Mr. P. returned to follow up with Dr. Sheikh, the wrist surgeon.  AR483, 485.  Mr. P. reported a pain level of 3.  AR484.  Dr. Sheikh placed Mr. P.'s wrist in a splint and warned Mr. P. to "avoid trauma, shear, [and] pressure against the wound," as well as to avoid tobacco products.  AR485.

On the same day, Mr. P. saw Dr. Patrick O'Brien at Avera Orthopedics and Sports Medicine in Sioux Falls "to review [his left] shoulder arthrogram[23] results.  AR486.  Mr. P. reported a pain level of 1.  AR488.  Dr. O'Brien noted "minimal tenderness to palpation over the AC joint."  Id.  He observed a "full, painless range of motion of the shoulder with no instability."  Id.  Dr. O'Brien assessed Mr. P. as having a shoulder sprain.  Id.

---

(S.D. Tex. June 29, 2021) (quotation omitted).

[22] Dr. Larson Shields' notes indicate that Mr. P. did not show up for his April 17 or April 22 appointments and that on April 24, Mr. P. cancelled his therapy through a request from workers' compensation.  AR541–42.

[23] An "arthrogram" is "[a]n x-ray picture of a joint after injection of air or radiopaque material into the joint."  Arthrogram, Attorney's Dictionary of Medicine (Release No. 56, 2022).

On April 26, Mr. P. returned to the oral surgeon, Dr. Moutray, for a follow-up appointment. AR414. It appears from Dr. Moutray's progress note that Mr. P. was experiencing "difficulty with eye movements [and] tinnitus,"[24] but there was an "improved opening of [his] mandible with decreased discomfort [in his] left cheek regions." Id. Dr. Moutray recommended "mandibular stretching exercises" and noted that Mr. P. was "cleared to return to work from a facial fracture stand point."[25] Id.

On the same day, Mr. P. saw Dr. Michael Devish to follow up concerning his pelvic fracture. AR480–81. Mr. P. reported feeling no pain. AR481. Dr. Devish devised a plan for Mr. P. to resume weight-bearing on his right leg and initiate physical and occupational therapy. AR483. Mr. P. was instructed to return in three weeks at which time he would possibly be "release[d] of [his lower extremity] work restrictions." Id.

On the same day, Mr. P. followed up with Dr. Ripperda concerning his head injury. AR602. Mr. P. stated that he was "doing well." Id. Mr. P.'s wife told Dr. Ripperda that Mr. P. was suffering from some memory problems. Id.

---

[24] The court notes that at Mr. P.'s March visit with Dr. Moutray, he was not experiencing difficulty with eye movements. AR428. But the entire relevant sentence in the April progress notes states "No new discomfort, no diplopia, difficulty with eye movements, tinnitus and improved opening of mandible with decreased discomfort left cheek regions." AR414. This court interprets the "nos" in that sentence as only qualifying the nouns that directly follow them. Cf. Barnhart v. Thomas, 540 U.S. 20, 26 (2003).

[25] Dr. Moutray's progress note from the March 27 visit also stated that Mr. P.'s workers' compensation case manager was provided "a note for work clearance." AR415, 421. So, in the context of his facial fracture, the record is unclear whether Mr. P. was cleared for work on March 27 or April 26.

Mr. P. "also note[d] that reading comprehension [was] not as automatic [as] it ha[d] been in the past." Id.  Mr. P. did not report being in "any specific pain." Id.  He did report suffering headaches when exposed to bright light, which was mitigated by using sunglasses.  Id.  Dr. Ripperda recommended speech therapy for his memory issues, certain physical therapy exercises, and a continued delay in returning to work.  AR603.  From a head-injury standpoint, Dr. Ripperda released Mr. P. to drive.  Id.

### III.   May 2018.

On May 1, Mr. P. visited with a speech language pathologist, Kennedy Weiland of Avera Therapy in Mitchell.  AR576–79.  Mr. P. reported "his main cognitive difficult[y]" to be memory, "stating that [it was] causing trouble in his every day life."  AR576.  Mr. P. reported "difficult[y] remain[ing] on task, completing paperwork and intermittent times of forgetfulness at work, all of which [were] not impairments prior to [his traumatic brain injury]."  Id.  Ms. Weiland reported that Mr. P.'s testing was within normal limits but recommended continued visits due to Mr. P.'s reported difficulties.  AR578.

On May 7, Mr. P. was evaluated by physical therapist Steven Van Genderen of Dakota Physical Therapy in relation to his pelvic fracture and hip pain and stiffness.  Mr. Van Genderen's notes chronicle Mr. P.'s trajectory from crutches, to "toe touch weight bearing followed by transition to a walker," to Mr. P. walking without a walker for 2 weeks.  AR530.  Mr. Van Genderen noted Mr. P.'s "intermittent pain" on a level of 0-3, but chief complaints of stiffness and weakness.  Id.  Mr. P.'s functional limitations were listed as "[w]alking,

11

standing, bending, sleeping, lifting, stairs, yard work, housework, job duties, and recreation."  Id.  Mr. Van Gendern considered Mr. P. to have "good rehabilitation potential."  Id.

On the same day, Mr. P. was re-evaluated by speech language pathologist Dr. Patricia Larson Shields in relation to post-concussion syndrome.  AR532.  Mr. P. underwent cognitive testing, and Dr. Larson Shields noted a "mild severity rating" in the results of Mr. P.'s Cognitive Linguistic Quick Test and memory testing.  Id.  Dr. Larson Shields created a treatment plan to include memory and attention exercises and "recall of story telling."  Id.

Mr. P. was also seen on May 7 by speech language pathologist Kennedy Weiland, who had Mr. P. "participate[] in tasks of increased complexity."  AR585.  Ms. Wieland found Mr. P. to have "[e]xcellent potential to reach and maintain [his] prior level of function."  Id.

On May 9, Mr. P. returned to speech language pathologist Dr. Larson Shields where he exhibited 88% accuracy with his memory and attention exercises.  AR533.  Dr. Larson Shields noted progress.  Id.

On May 14, Mr. P. underwent a CT scan of his right wrist at Avera Queen of Peace Hospital.  AR590.  Dr. Suzanne Woodward observed "ongoing healing" at the point where the screw was inserted into Mr. P.'s wrist.  Id.  She also noted "radiocarpal joint effusion."[26]  Id.

---

[26] The radiocarpal joint is one of the joints that comprise the wrist.  Am. Gen. Ins. Co. v. Florez, 327 S.W.2d 643, 647 (Tex. Civ. App. 1959).  "Effusion is the escape of a fluid from anatomical vessels by rupture or exudation."  Ayala v. Kijakazi, 620 F. Supp. 3d 6, 20 n.9 (S.D.N.Y. 2022) (quotation omitted).

On May 15, Mr. P. returned to Dr. Larson Shields where he exhibited between 92% and 100% in his memory exercises.  Id.  Dr. Larson Shields noted continued progress.  Id.

Mr. P. also returned to speech language pathologist Kennedy Wieland on May 15 who stated that Mr. P. "continue[d] to do well with attention and recall."  AR583.  She reiterated her observation that Mr. P. had "[e]xcellent potential to reach and maintain [his] prior level of function."  Id.

On May 17, Mr. P. returned for follow-up with the wrist surgeon, Dr. Sheikh.  AR473.  Mr. P. stated "he [did] not have any pain."  Id.  At this time, Mr. P.'s wrist was immobilized with a brace.  Id.  Dr. Sheikh reported "active flexion sensation and extension of digits noted [to] be grossly intact."  AR475.  Mr. P. was instructed to remain immobilized in the brace, and to avoid "dipping tobacco chewing, given [the] negative impact on bony healing and overall recovery."  Id.

On the same day, Mr. P. saw Dr. Patrick O'Brien for a follow-up for shoulder pain.  AR478–79.  Mr. P. reported "no current pain in the shoulder and [he felt] that he [could] do everything functionally with no limitations."  AR480.  Dr. O'Brien placed Mr. P. "at full duty with no restrictions in regards to the left shoulder."  Id.

Also on May 17, Mr. P. returned to the speech language pathologist, Kennedy Weiland.  AR580.  Mr. P. exhibited between 95% and 100% accuracy in his attention and memory exercises.  Id.

On May 22, Mr. P. returned to the speech language pathologist, Dr. Patricia Larson Shields, where he exhibited between 96% and 100% in his exercises.  AR533.  Dr. Larson Shields found that Mr. P. "met all the goals and objectives" of his therapy and discharged him.  Id.

May 22 also marked Mr. P.'s last visit with speech language pathologist Kennedy Weiland.  AR574.  Mr. P. exhibited 100% in all of his attention and memory exercises.  AR573–74.

Mr. P.'s Dakota Physical Therapy progress notes for May 24 note that Mr. P. indicated "things [were] going pretty well," and that he "may have been a little lax on [his] exercises getting caught up on some spring yardwork." AR528.  Mr. P. indicated it took "a little more time to get things done."  Id.  The physical therapist assistant noted minimal to moderate fatigue, especially when Mr. P. performed hip abduction and hip adduction exercises.  Id.  The notes assessed that Mr. P. was responding well to treatment and was progressing toward his [patient] goals.  Id.

Mr. P.'s Dakota Physical Therapy progress notes for May 29 are mostly illegible, but the court notes "that overall,"  Mr. P. felt he was "continu[ing] to get stronger."  Id.  The notes assessed that Mr. P. was responding well to treatment and was progressing toward his [patient] goals.  Id.

**IV.    June 2018.**

Mr. P.'s Dakota Physical Therapy progress notes for June 5 are also mostly illegible, but the court notes that Mr. P. stated, "his legs [felt] like jelly."

Id.  The notes assessed that Mr. P. was responding well to treatment and was progressing toward his [patient] goals.  Id.

On June 6, Mr. P. returned for follow-up with the wrist surgeon, Dr. Sheikh.  AR470–71.  Mr. P. reported a pain level of 4 without medication.  AR472.  Dr. Sheikh noted a 5-degree difference in the supination of Mr. P.'s right wrist, as well as a 35lb difference in grip.  Id.  Dr. Sheikh noted "ongoing healing and minimal . . . displacement."  Id.  Mr. P. was instructed that he could "discontinue use of [his wrist] brace except [at] nighttime," and was warned to avoid "loading of the wrist more than 5 pounds."  Id.  Mr. P. was advised to ice his wrist after activity, and avoid "trauma, shear . . . pressure against the wound," and tobacco products.  Id.

On the same day, Mr. P. followed up with Dr. Ripperda concerning his head injury.  AR607.  Mr. P.'s "[c]hief complaint [was] memory difficulties."  Id.  Mr. P. stated that otherwise, "he [was] doing well," but still had some issues with changing moods, as well as "[s]ome fatigue towards the end of the day."  Id.  Mr. P. stated that "otherwise, [he felt] that his cognitive status [had] been improving."  Id.  Mr. P.'s MoCA test was in a normal range.  Id.  Mr. P. reported not having any "new cognitive symptoms," nor headaches, dizziness, or lightheadedness.  Id.

Mr. P.'s Dakota Physical Therapy progress notes for June 8 note that Mr. P. "got the brace off [his] wrist . . . and was okayed to return to work 6/18."  AR527.  Mr. P. reported that his arm was "real sore."  Id.  The notes recognized "gradual gains in muscle length," and "minimal fatigue."  Id.  The notes

assessed that Mr. P. was responding well to treatment and was progressing toward his [patient] goals.  Id.

Mr. P.'s Dakota Physical Therapy progress notes for June 12 note that he was "doing pretty good," and was returning to work (4 hours per day) the following Monday.  Id.  He stated his wrist to be "really the only thing giving [him] grief."  Id.  He also stated that "he keeps busy at home."  Id.  The provider noted continuing increase in muscle length, as well as a moderate, but improving, challenge with balancing activities.  Id.  The notes assessed that Mr. P. was responding well to treatment and was progressing toward his [patient] goals.  Id.

On the night of June 12, Mr. P. participated in a sleep study at Avera McKennan Hospital on complaints of "snoring, witnessed apnea, and insomnia."  AR437, 527.  His attending physician, Dr. Anthony Hericks, diagnosed Mr. P. with hypersomnolence[27] and mild obstructive sleep apnea. AR438.  Dr. Hericks recommended that Mr. P. refrain from driving or operating "high risk equipment if he is tired until sleep disorder breathing is adequately treated with good control, compliance and symptom improvement."  Id.  For this treatment, Dr. Hericks recommended Mr. P. participate in a trial using a CPAP machine.  Id.

---

[27] "Hypersomnia refers to medical conditions in which [a patient feels] excessively tired during the day (called excessive daytime sleepiness) or sleep[s] longer than usual at night."  *Hypersomnia*, NAT'L INST. OF NEUROLOGICAL DISORDERS AND STROKE, https://www.ninds.nih.gov/healthinformation/disorders/hypersomnia (last visited Sep. 15, 2023).

On June 21, Mr. P. returned to Avera Neurosurgery for what appears to be a follow-up, this time with Dr. Michael Puumala.  AR456.  Dr. Puumala noted that:

> [Mr. P.] had initially been having difficulties with postconcussion symptoms but these have been improving.  He denies headaches today and states his dizziness and balance difficulties have improved.  He does have some short term memory issues.  He does report some nausea and reflux issues in the mornings.  He has returned to work part time as per Dr. Ripperda.

Id.

Dr. Puumala did not place any restrictions on Mr. P.  AR459.  He stated in his report that Mr. P. could wear a hard hat for work.  Id.

At Mr. P.'s June 22 occupational therapy evaluation—related to Mr. P.'s wrist fracture—therapist Brooke Hillman of Dakota Physical Therapy observed pain in Mr. P.'s right wrist, and general muscle weakness.  AR544.  She noted that Mr. P. complained of "pain, decreased [range of motion], decreased functional strength, and impaired [fine motor coordination] and impaired ability to perform [the activities of daily living]."  AR564.  A treatment plan was developed for Mr. P.  AR565.

At Mr. P.'s June 25 occupational therapy session, he reported a wrist pain level of 4 and was educated on the various therapeutic methods he would undertake.  AR545.

On June 28, Mr. P. returned to Dr. Sheikh, the wrist surgeon, for follow-up.  AR468.  According to the report, Mr. P. was [a]dvised to continue therapy . . . avoid trauma, shear, [and] pressure against the wound . . . follow-up for serial evaluation . . . [and] avoid . . . tobacco."  Id.

17

Mr. P.'s Dakota Physical Therapy progress notes for June 28 note that Mr. P. had returned to work, and that "his legs [and] back [were] feeling good." AR527.  Mr. P. continued to cite his stiff wrist as "giv[ing] him the most difficulty."  Id.  The provider noted "continual progress [and] continued strength."  Id.  Mr. P. reported that his "doctor was not happy that he had not been to therapy as directed[28] and was not completing [his home exercise program]."  AR545.

## V.   July 2018

Mr. P.'s Dakota Physical Therapy progress notes for July 2 state that Mr. P. "continue[d] to feel he [was] getting stronger," but that his "wrist [continued] to bother [him].  AR526.  The report noted "[i]mproved performance [in Mr. P.'s] activities," but that Mr. P. "still fatigue[d] quickly [in said] activities."  Id.  The notes assessed that Mr. P. was responding well to treatment and was progressing toward his [patient] goals.  Id.

Mr. P.'s Dakota Physical Therapy note for July 3 reported "increased motion" in Mr. P.'s wrist.  AR546.

Mr. P.'s Dakota Physical Therapy progress notes for July 9 state that Mr. P. "indicate[d] that his back, hip, and leg [felt] really good."  AR526.  Mr. P. stated that "he gets a little sore [by the] end of [the] workday, but not too bad." Id.  Mr. P. noted that his right wrist "still [gave] him trouble," but that he was ready to be discharged from Dakota Physical Therapy's care and to do home treatment.  Id.  Mr. P. was discharged from physical therapy.  Id.  The notes

---

[28] Mr. P. was a no call no show at his June 26 appointment.  AR545.

18

assessed that Mr. P. was responding well to treatment and was progressing toward his [patient] goals.  Id.

Mr. P.'s Dakota Physical Therapy note for July 10 states that Mr. P. was using his wrist "functionally at work."  AR547

Mr. P.'s Dakota Physical Therapy note for July 11 states that Mr. P. was failing to complete "longer stretching at home," and was "educated on [the] need for these exercises.  Id.  Brooke Hillman, his therapist, noted that Mr. P. displayed an "[i]ncreased tolerance to wrist flexion."  Id.

Mr. P.'s Dakota Physical Therapy note for July 12 once again stated that Mr. P. was not completing his "strengthening at home."  Id.  Ms. Hillman noted an "increased [range of motion]" in Mr. P.'s wrist.  Id.  But Ms. Hillman also noted that Mr. P.'s right wrist "[m]otion [was] not in [a] typical pattern compared to [his left] wrist."  Id.

Mr. P.'s Dakota Physical Therapy note for July 17 states that Mr. P. reported not stretching "as much."  AR548.  Mr. P. was once again reminded of the importance of stretching.  Id.  Ms. Hillman noted a decreased range of motion at this visit and warned Mr. P. of a "closing window due to scar tissue build up."  Id.

In Ms. Hillman's July 21 periodic reporting notes, she stated that Mr. P. had "progressed well since [his initial] evaluation."  AR561.  She noted gains in Mr. P.'s range of motion, with a daily pain level of 4, which increased to 10 with stretching.  Id.  She noted that Mr. P. was "unable to complete work tasks without pain or difficulty."  Id.

Mr. P.'s Dakota Physical Therapy note for July 23[29] stated that Mr. P. experienced a daily pain level of between 4 and 5, and that he did not complete his home exercises.  AR549.

Mr. P.'s Dakota Physical Therapy note for July 27 noted that Mr. P. was "not . . . stretching at home much," but was "trying during the day at work." AR549–50.  Pain was noted when Mr. P. stretched his wrist.  AR550.

Mr. P.'s Dakota Physical Therapy note for July 31 indicated that Mr. P. was "completing some of" his home exercise program.  AR551.

## VI.    August 2018.

Mr. P.'s Dakota Physical Therapy note for August 1 indicated that Mr. P. was "stretching some," and that his wrist felt "stiff and slightly painful."  Id. Ms. Hillman noted an "increased [range of motion]" at the end of his session. Id.

On August 2, Ms. Hillman noted Mr. P. as having "decreased pain with stretch."  Id.

On August 6, Mr. P. reported to Ms. Hillman a pain level of 6 in his wrist, due to using it "more at work."  AR552.  Mr. P. was again reminded of the importance of completing his home exercise plan.  Id.  This was Mr. P.'s last wrist appointment at Dakota Physical Therapy.  AR552-54, 557.

---

[29] Mr. P. missed his July 19 and 20 appointments due to his wife giving birth. AR548.

In Ms. Hillman's August 8 periodic reporting notes, she stated that Mr. P. "has made minimal progress this reporting period.  This is likely due to patient not completing [his home exercise plan] as directed."  AR558.

On August 13, Mr. P. underwent an MRI of his right wrist at Avera Queen of Peace Hospital in Mitchell.  AR587.  Dr. Suzanne Woodward noted that the threaded screw was holding Mr. P.'s scaphoid fracture in place.  Id. She observed "[m]ild remaining bone marrow edema-enhancement at the fracture site."[30]  Id.  She also observed "mild radiocarpal and DRUJ synovitis"[31]

---

[30] "Bone marrow edema syndrome is a diagnosis of exclusion that is characterized by pain and increased interstitial fluid within bone marrow without an obvious cause."  Donald D. Davis & Steven M. Kane, *Bone Marrow Edema Syndrome*, NAT'L LIBR. OF MED. (June 5, 2023), https://www.ncbi.nlm. nih.gov/books/NBK559176/.  "Diagnosis of exclusion means a recognition of a disease by excluding all other known diseases."  DuMond v. Centex Corp., 172 F.3d 618, 621 n.6 (8th Cir. 1999) (quotation omitted).  "Interstitial fluid" is "[t]he fluid of the body situated in the spaces between the cells."  *Interstitial fluid*, Attorney's Dictionary of Medicine (Release No. 56, 2022).

[31] "Synovitis is defined as 'inflammation of a synovial membrane.  It is usually painful, particularly on motion, and is characterized by a fluctuated swelling due to effusion within a synovial sac."  Ayala, 620 F. Supp. 3d at 20 n.9 (quotation omitted).  "A synovial membrane is the connective tissue . . . that lines the cavity of a synovial joint and produces the synovial fluid.  A synovial joint is a joint in which the opposing bony surfaces are covered with a layer of hyaline cartilage or fibrocartilage."  Ruiz v. Comm'r of Soc. Sec., No. 1:18-cv-09659 (SDA), 2020 WL 728814, at *2 n.4 (S.D.N.Y. Feb. 13, 2020) (quotations omitted).  "DRUJ" (distal radioulnar joint) refers to another joint that comprises part of the wrist.  Linton v. Zorn, No. 5:18-cv-5, 2022 WL 17080324, at *12 (D. Vt. Oct. 19, 2022).  A "synovial sac" is "[t]he space within a joint which is surrounded by the synovial membrane.  Roughly, the synovial membrane of a joint may be visualized as the lining of a lined glove.  The space occupied by the hand is comparable to the synovial sac."  *Synovial sac*, Attorney's Dictionary of Medicine (Release No. 56, 2022).

and "mild 2nd extensor compartment tenosynovitis."[32]  Id.

On August 23, Mr. P. returned for follow-up with his wrist surgeon, Dr. Sheikh.  AR465–67.  Dr. Sheikh noted that Mr. P.'s bone was healing.  AR467.  Mr. P. was "[a]dvised to continue [home] therapy."  AR470, 557.  Mr. P. complained of a pain level of 6.  AR467.  Dr. Sheikh noted in his report that "[p]ain [was] well controlled."  Id.  Dr. Sheikh recorded a 22lb difference in grip between Mr. P.'s left and right wrist.  Id.  Mr. P. was "discharged from [the] clinic at full duty," but was instructed to continue to follow up.  Id.  He was also instructed to avoid tobacco.  Id.

August 24 was the official "end of care" date vis-à-vis Mr. P.'s wrist therapy at Dakota Physical Therapy.  AR557.  Dr. Sheikh ordered the discharge because he felt Mr. P. could "progress toward [his] end ranges with [his home exercise plan]."  Id.

**VII.   September 2018.**

On September 20, Mr. P. underwent a neuropsychological evaluation conducted by Dr. Michael McGrath of Neuropsychology Consultants, LLC of Sioux Falls.  AR341.  Dr. McGrath considered Mr. P.'s test results to indicate a "good recovery from [the] head injury," and opined that there would "likely be some further recovery over at least the next six months."  AR343.  Dr. McGrath considered Mr. P. cognitively capable of returning to work, "though he [might]

---

[32] "Tenosynovitis is defined as inflammation of a tendon sheath."  Durrett v. Leading Edge Prods., 965 F. Supp. 280, 282 n.2 (D. Conn. 1997) (quotation omitted).  A "tendon sheath" is "[a] thin membrane which forms a sleeve-like covering around a tendon, as at the wrist joint and ankle joint."  *Tendon sheath*, Attorney's Dictionary of Medicine (Release No. 56, 2022).

be somewhat less efficient than he was prior to his injury." AR344.  Dr. McGrath considered Mr. P. to be functioning well emotionally.  AR344.  He further believed that Mr. P. was not in need of "any further cognitive rehabilitation."  Id.

## VIII.  October 2018.

On October 10, Mr. P. followed up with Dr. Ripperda, apparently for an overall check-in for all of his injuries.  AR611.  Dr. Ripperda noted that Mr. P. was "continu[ing] to do well."  Id.  Mr. P. continued to complain of having memory issues.  Id.  Mr. P. stated that his right hip was "feeling good."  Id.  Mr. P. reporting "[c]ontinu[ing] to have grip strength difficulties and persistent wrist pain" that was "aching and sharp."  Id.  Dr. Ripperda observed that Mr. P. was "doing quite well at this point," and allowed Mr. P. to "continue to work without formal restrictions."  AR610.

## IX.  December 2018.

On a similar follow-up visit on December 14, Mr. P. reached what Dr. Ripperda believed to be maximum medical improvement.  AR614–15.  As to each specific injury, Dr. Ripperda noted: (1) Mr. P.'s left eye contusion and subsequent fractures healed without surgical intervention with "no visual deficits, [and] good extraocular muscular function; (2) Mr. P.'s shoulder sprain healed without surgical intervention with no "range of motion deficits;" (3) Dr. Ripperda recognized a 12% whole person impairment related to Mr. P.'s scaphoid fracture; (4) Dr. Ripperda recognized a 6% whole person impairment related to Mr. P.'s acetabular fracture; and (5) Dr. Ripperda recognized a 15%

23

whole person impairment related to Mr. P.'s brain injury.  AR615.  In total, Dr. Ripperda recorded Mr. P.'s whole person impairment caused by the fall to be 30%.[33]  AR616.  Informing Dr. Ripperda's calculation of Mr. P.'s brain impairment were an "alteration in MSCHIF"[34] and a score of 70 for Mr. P.'s global assessment of functioning.[35]  AR615.

Mr. P. noted he still had some problems with mood lability.  AR616.  Mr. P. also noted continued, infrequent pain in his hip (level 4 when it "flares up") and ongoing wrist pain (level 7 at its worst).  Id.  It was Dr. Ripperda's opinion that Mr. P. required no more treatment at that time and that he was released with no restrictions as to his hip or wrist.  Id.  Mr. P. confirmed that when using his Zoloft as prescribed, his mood symptoms remained under "okay control."  Id.

---

[33] Pursuant to SDCL § 62-4-6, Mr. P. received a lump-sum workers' compensation payment on February 16, 2019, to compensate for this permanent partial disability.  AR190.  The record does not clarify why the sum calculated by Dr. Ripperda was 30%, even though the sum of the individual whole person impairment percentages appears to be 33%.  AR615–16.  The court hazards no opinion as to the accuracy of these calculations, and that accuracy is collateral to the present matter.

[34] MSCHIF is an acronym that stands for "mental status, cognition, and highest integrative functioning."  State v. Beaulieu, 917 N.W.2d 211, 215 (N.D. 2018).

[35] A [Global Assessment of Function] score represents a clinician's judgment of an individual's overall level of functioning."  Woodbury v. Colvin, 213 F. Supp. 3d 773, 781 (D.S.C. 2016) (quotation omitted).  The scores range from 0-100, "with a higher score representing a higher level of functioning."  Id. (citation omitted).

**X.    February 2019.**

On February 7, 2019, Mr. P. followed up with his primary care physician Dr. Douglas Holum at the Mitchell Clinic, for "increasing depression" and sleep apnea.  AR513, 573.  Dr. Holum noted that he would refill Mr. P.'s prescription for Zoloft (sertraline), which worked well for his depression.  AR513.  Dr. Holum also noted that, despite the recommendation of the sleep study, a CPAP machine "was never followed through on."  Id.  Dr. Holum noted that Mr. P. would "get the CPAP ordered."  Id.

On February 27, Mr. P. returned to Dr. Holum with concerns "that his Zoloft may be causing memory concerns."  AR514.  Mr. P. stated he was "getting more forgetful, losing tools, etc."  Id.  Dr. Holum decided to wean Mr. P. off of the Zoloft and follow up with him in 1-2 months.  Id.

**XI.    March 2019.**

On March 19, Mr. P. returned to Dr. Ripperda concerning his "intermittent memory difficulties . . . difficulties completing his paperwork," disorganization, and problems sleeping.  AR621.  Mr. P. confirmed that his mood was doing well using his prescription Zoloft.  Id.  Dr. Ripperda recommended a new MRI, "formal neuropsychometric testing," and speech therapy.  AR620.

**XII.    May 2019.**

On May 21, Mr. P. underwent a new neuropsychological evaluation conducted by Dr. Michael McGrath and ordered by Dr. Ripperda.  AR345. Dr. McGrath concluded that Mr. P. had "displayed some further recovery in

cognitive functioning, relative to the evaluation of 9/2018 . . . especially in terms of visuospatial abilities." AR351.  Dr. McGrath was uncertain on the cause of Mr. P.'s memory-related issues and suggested that the problems "may be more apparent than real, due to fortuitously good auditory memory performance at the earlier evaluation." Id.  Dr. McGrath opined that Mr. P. should be able to work as a journeyman, though whether he could resume functioning as a foreman was an "empirical question." AR352.  It was revealed in Dr. McGrath's report that Mr. P. had still not made use of a CPAP machine, and that such use might assist with "both physical endurance and memory functioning." Id.  Dr. McGrath noted "possibly more dysphoria[36] than displayed at the earlier evaluation," though this was denied by Mr. P.  Id.

### XIII.  June 2019.

Mr. P. followed up with Dr. Ripperda on June 4.  AR624.  Dr. Ripperda noted that Mr. P. "continue[d] to have some difficulties with divided and distracted memory." AR625.  Otherwise, Mr. P. performed well in his neuropsychometric testing.  Id.  Mr. P. complained of feeling fatigue at the end of the day.  Id.  Dr. Ripperda recommended that Mr. P.'s occupation and at-home activities were limited to those that can be accomplished one at a time. AR624.

---

[36] "Dysphoria" is "[t]he feeling of being unwell; a vague but troubling discomfort."  *Dysphoria*, Attorney's Dictionary of Medicine (Release No. 56 2022).

## XIV.  July 2019.

Mr. P. returned for a follow up with Dr. Ripperda on July 16.  AR629.
Dr. Ripperda noted that "overall [Mr. P. has] done quite well."  Id.  Mr. P.'s
neuropsychometric testing showed some improvement.  Id.  Mr. P. continued to
struggle "in an environment that required a lot of divided attention and
simultaneous tasks and multitasking."  Id.  Mr. P. was unable to return to
work since his previous visit to Dr. Ripperda.  Id.  Mr. P. continued to complain
of wrist pain and weakness in grip, as well as two episodes of dizziness.  Id.  In
one of these episodes, Mr. P. was unable "to identify where he was at when
driving."  Id.

Dr. Ripperda considered the wrist complaints "expected from a scaphoid
fracture."  AR628.  Dr. Ripperda wanted to monitor Mr. P.'s (apparently single
episode of) difficulty putting a shoe on.  Id.  Dr. Ripperda did not consider Mr.
P. additionally impaired beyond what was earlier stated and reiterated his
belief that Mr. P. could undertake work that only required "maintain[ed] focus
on one specific task."  Id.; see also AR340.

## XV.  December 2019.

On December 13, Mr. P. underwent a "mental status examination," in
connection with a determination of benefits by South Dakota Disability
Determination Services.  AR632.  The conditions for which Mr. P. stated his
"alleged disability [were] depression, memory, mood, brain injury, wrist, pelvis
and shoulder problems."  Id. (internal quotation marks omitted).  The
evaluator, Dr. Emily Blegen, entered an impression of "no diagnosis."  AR637.

27

## XVI.  February 2020.

Mr. P. returned to the Mitchell Clinic on February 10, 2020, to discuss the results of his mental status examination.  AR641.  His provider noted that "[Mr. P.] is functional, back to work, and doing activities, although he does get frustrated with his memory limitations.  He feels like he cannot memorize things as easily or has as much recall as he did previously."  Id.  This was Mr. P.'s last visit to a physician.  AR38.  Mr. P. stated at his hearing he has not returned to a physician because of the COVID crisis.  Id.

### PROCEDURAL POSTURE

## I.   Mr. P.'s Social Security Disability Claim

On either May 20 or 21, 2019, Mr. P. filed a Social Security Disability Claim by telephone interview.  AR11, 194, 224–25.  Mr. P. listed the conditions limiting his ability to work as "[b]rain [i]njury, broken wrist, fractures to [pelvis], tore shoulder, [m]ood swings [and] [d]epression, [m]emory [i]ssues, [and] [s]taying focused and on task."  AR227.  Mr. P. listed medicines he was taking as "[m]elatonin, [p]ain med unknown, pain med unknown, [p]ain meds unknown, Sertraline, Sertraline, [and] several pain meds unknown."[37]  AR230. Mr. P. noted he was "[s]till having issues with pain with physical activity like stairs, ladders, too much walking, jogging."  AR231.

---

[37] The court confirms that the question Mr. P. responded to asked, "Are you taking any medications?"—i.e., in the present tense.  AR229.  Mr. P. listed different providers, including "Rapid City Regional," in tandem with his medication responses.  AR230.  This court interprets Mr. P.'s response as misunderstanding the question and providing a list of all medications taken post-accident.

The SSA released a Report of SGA[38] Determination, also on July 9, 2019, requiring an evaluation of Mr. P.'s work activity.  AR246.  This requirement appears to have stemmed from Mr. P.'s alleged [disability] onset date being March 8, 2018, despite Mr. P. having worked between June 1, 2018, and February 20, 2019.  Id.

According to Mr. P.'s Social Security Administration Work Activity Report, completed on July 9, 2019, Mr. P. resumed part-time work on June 1, 2018, advancing to full-time on July 15, 2018.  AR250–51.  Correspondingly, Mr. P.'s workers' compensation benefits terminated on June 1, 2018.  AR194.  Mr. P.'s work end-date is listed as February 20, 2019.  AR251.  The listed reason for Mr. P.'s work ending was "[m]y physical and/or mental condition(s)." AR254.  Mr. P. collected unemployment between the third quarter of 2019 and the first quarter of 2020.  AR219.

On September 7, 2019, Mr. P.'s wife completed a Social Security Administration Function Report - Adult - Third Party, where she noted:

> He has constant pain in the wrist that was broke, hard to walk or stand long periods of time & can't climb ladders due to the injured (fractured) hip.  Can't focus or multi task & has a hard time remembering from brain injury.  Every day task are even hard for him.

AR260.

In response to a prompt asking "what [Mr. P.] does from the time he . . . wakes up until going to bed," Mrs. P. wrote:

---

[38] "SGA" stands for "substantial gainful activity."  Brett M. v. Saul, 611 F. Supp. 3d 771, 779 (D.S.D. 2020) (quotation omitted).

> Wakes up—trys to have morning routine of helping me get kids ready for day care—Does puzzles to try to help memory—works on small tasks wife (me) lists out so he doesn't get overwhelmed—assist me with taking kids to daycare or pre-school.  Assist with night routine with kids (Baths, Supper, read to kids, Bedtime)

AR261.

When prompted to state whether Mr. P. takes care of anyone, Mrs. P. wrote that Mr. P. "assist[s] her with [their] 3 children," and that she "tr[ies] to have routines so it helps [with his] memory [and he] doesn't get overwhelmed." Id.  Mrs. P. stated that her father helps Mr. P. "when checking on cattle," and that she "take[s] care of the house pets," because Mr. P. "can't remember to feed dogs or ducks."  Id.

When comparing Mr. P.'s pre-accident state to his current state, Mrs. P. stated that where before Mr. P. did "everything," now Mr. P. has difficulty using his right hand, that he has had to relearn "everything" with his left hand.  Id. She stated he wants to sleep all the time and has developed sleep apnea.  Id. She stated Mr. P. has difficulty with snap button shirts, forgets to shave unless reminded, and will forget to put on deodorant or brush his teeth if his "morning routine is mixed up."  Id.  She followed up by stating Mr. P. "[f]orget[s] to brush [his] teeth a lot." AR262.  She stated he forgets to get his hair cut.  Id.  She stated Mr. P. is "off all meds now except [a multi-vitamin]", which Mr. P. forgets to take unless reminded.  Id.

As far as food preparation, Mrs. P. stated that Mr. P. is able to grill "if it is prepared for him or make mac n' cheese for kids," but that he "[g]ets overwhelmed with [a lot] of steps—needs to be very simple."  Id.  She noted that

Mr. P. "mows the lawn [which is] easy [because] it's in a circle[,] uses [a] weed whacker[,] waters [the] garden[,] can do simple things like change a light bulb [and] [t]ake[ ] out [the] garbage." Id.  However, Mr. P. "can't focus enough to complete" laundry or the dishes, because he "gets overwhelmed easily." Id.

She noted that Mr. P. is able to drive a car and an ATV.  AR263.  He is able to do infrequent grocery shopping but needs a list. Id.  Mrs. P. noted that while Mr. P. is able to count change and use a checkbook, she pays all of the household bills because Mr. P. forgets. Id.

For hobbies, Mrs. P. wrote that Mr. P. enjoys "watching sports (when able or on TV), fishing (every other weekend), hunting (seasonal), playing [with his] children (daily)," but noted that it is hard for Mr. P. to throw a ball because of his injured wrist.  AR264.  She noted that he fishes a lot more since his injury and that it relaxes him. Id.  She noted Mr. P.'s difficulty playing on the ground with the kids because of Mr. P.'s hip injury. Id.  She noted Mr. P. socializes with family in-person and on the phone every other day, and that he regularly visits his father-in-law. Id.  Mrs. P. noted that Mr. P. needs to be reminded to attend his medical appointments. Id.  She stated Mr. P. is no longer able to tolerate alcohol because of bad side effects, and "[h]as been sober since [November] 2018." AR265.

The activities Mrs. P. identified Mr. P. as having difficulty with, chosen from a list on the form, were lifting, walking, stair climbing, following instructions, memory, using hands, standing, completing tasks, and concentration. Id.  Mrs. P. drew circles, which this court interprets as

31

emphasis, around stair climbing, memory, completing tasks, and concentration.  Id.  Mrs. P. stated that Mr. P. can walk one mile before needing to stop and rest.  Id.  Mrs. P. stated that Mr. P. can pay attention for "[n]ot long at all—maybe [five minutes]."  Id.  Mrs. P. stated that Mr. P. does not do well with written instructions that are presented in paragraph form but does better when the instructions are listed and few in number.  Id.

Mrs. P. wrote that Mr. P. does well with authority figures.  AR266.  She noted that Mr. P. was fired from his job due to his injuries.  Id.  She wrote that it is hard for Mr. P. "to handle stress," and that in stressful situations, Mr. P. "gets overwhelmed, crabby, frustrated."  Id.  She noted that he "starts forgetting things if not in [a] routine."  Id.  Mrs. P. also noted a change in Mr. P.'s demeanor, stating that he "use[d] to be easy go lucky—Now, gets angry fast—short temper."  Id.

On September 11, 2019, Mr. P. completed a Social Security Administration Function Report - Adult, where he noted:

> The brain injury has made it hard for me to do simple tasks.  I have a hard time staying focused & can not multy task.  I have trouble remebering how to do things I did before.  I broke my wrist which has made it very difficult to do anything with my right hand. Troubles gripping hammer, wrenches, and drills.  Fracture my pelvis which make it hard to be on my feet for long periods of time. Climbing Ladders is very difficult.

AR271.

Where the form asked "what [he does] from the time [he] wake[s] up until going to bed, Mr. P. wrote:

> First I help my wife get our 3 boys ready for Daycare.  Second I will work on tasks at home.  We made a list and I try to do whats on the

32

list.   I Do some puzzles and word scape game to keep my mind
working.  Take oldest to Pre-school [and] help with Nightly routine

AR272.

Mr. P. wrote that he "help[s] [his] wife care for [their] 3 sons.  Id.  He
wrote that his father-in-law and brothers-in-law "help [him] check cows [and]
care for [the P.s' ] cattle."  Id.  Mr. P. described his transition from being an
early starter who "did absolutely everything" to someone who cannot "get
enough sleep and struggle[s] getting up."  Id.  Mr. P. indicated he had difficulty
getting his "right sock on and off," and how his injury apparently caused him to
need to use a different hand to wipe when using the toilet.  Id.  Mr. P. indicated
that he needs reminders for tasks such as personal grooming and taking
medicine.  AR273.  Mr. P. noted that he does "grill once every other week" when
asked if he prepared his own meals.  Id.  As to household chores, Mr. P. wrote
that he "mow[s] [and] help[s] [his] wife [with] chores," but stated that he needed
to be told by his wife to perform such acts.  Id.  He wrote that in relation to
such work, he "get[s] overwhelmed easily."

Mr. P. wrote that he is able to transport himself either by driving a car or
an ATV.  AR274.  He also wrote that he infrequently shops for groceries.  Id.
He wrote that he is able to count change and use a checkbook/money orders.
Id.  Mr. P. wrote that he enjoys playing with his children every day, and
hunting and fishing when he is able.  AR275.  However, he noted that he has
trouble throwing a ball and "hold[ing] a fishing pole [with his] right hand.  Id.

Socially, Mr. P. wrote that he spends time with friends and family in
person or on the phone every day.  Id.  He attends his kids' "soccer once a

33

week." Id.  Mr. P. indicated that he requires a reminder when he has appointments, and that he needs his wife to accompany him to said appointments.  Id.  Mr. P. lamented the loss of fraternity with his co-workers and the feeling of accomplishment he previously felt at the end of the workday. AR276.

Mr. P. wrote that he can walk 1/2 mile before requiring 10-15 minutes rest.  Id.  He wrote that he can pay attention for ten minutes.  Id.  He wrote that he does not finish what he starts, "[f]or example, a conversation, chores, reading, [or] watching a movie."  Id.  Mr. P. indicated that his ability to follow instructions increases as the number of instructions decreases.  Id.

Mr. P. wrote that he does not handle stress nor changes in routine well. AR277.  Mr. P. noted he "get[s] frustrated because [he] can't do what [he] use[d] to do."  Id.

## II.    SSA's Initial Determination

In a letter dated January 7, 2020, the Social Security Administration denied Mr. P.'s disability claim.  AR74.  The reason stated was that Mr. P. was "not disabled under [the SSA's] rules.  Id.

The state agency medical consultant, Dr. Lawrence Landwehr, noted that Mr. P.'s "skull fractures had healed, gait was normal, shoulder shrug was normal, strength and motor exams were normal and other exam findings were normal."  AR62.  He also noted an "[o]rtho exam note[d] [Mr. P.'s] wrist fracture had healed and he was to return to full duty."  Id.  Dr. Landwehr noted that Mr. P. "cares for children, prepares meals, does housework, does yardwork,

34

drives a car and ATV, shops in stores, and manages money." Id.  He noted Mr. P.'s assertions of difficulty with "lifting, standing, walking and stair climbing," but also noted Mr. P.'s "ability to ambulate 1 mile before having to rest for 5 minutes." Id.  Considering the totality of the evidence, Dr. Landwehr considered Mr. P.'s "physical impairments as non-severe." Id.

The State agency psychiatric consultant, Dr. Bruce Lipetz, viewed Mr. P.'s complaints of "mood, memory and concentration problems" as inconsistent with the medical record.  AR63–64.  He also considered Mrs. P.'s claims associated with her husband's mental problems "grossly exaggerated." AR64.

On January 22, 2020, Mr. P. underwent a vocational evaluation "to measure his present capacity for employment and earnings," performed by Tom Audet of MAVR Consulting Services, Inc.  AR353.  This test concerned itself with whether Mr. P. could "earn at or above the two workers compensation rates indicated in the South Dakota Department of Labor files."  AR359.  The evaluation, taking into consideration Mr. P.'s alleged loss of upper extremity strength, concluded that he could not.  Id.

On February 13, 2020, Mr. P. telephonically completed a request for reconsideration.  AR78.  In a letter dated June 26, 2020, the Social Security Administration denied Mr. P.'s request for reconsideration, finding that "the previous determination was proper under the law."  AR80.  The state agency medical consultant at the reconsideration level, Dr. John Lassegard, stated "[t]he prior determination is consistent with the evidence and well supported."

35

AR69.  The state agency psychiatric consultant at the reconsideration level, Dr. Jerry Buchkoski, stated the same.  AR71.

On November 12, 2020, Mr. P. requested a hearing to dispute his denial of benefits.  AR101.  A hearing before an administrative law judge was scheduled for June 4, 2021.  AR181.  The administrative law judge hired a third-party vocational and rehabilitation consultant, Dr. David Perry, to attend the hearing and "give testimony as a vocational expert."  AR176, 328.

### III.   Mr. P.'s Hearing Before the ALJ

On June 4, 2021, the hearing was conducted (remotely due to COVID) before Administrative Law Judge Hallie Larsen (the ALJ).  AR34, 134.  At the hearing, Mr. P. revised his alleged onset date to June 30, 2019, because that was ostensibly the last day he worked.[39]  AR11, 39.

Mr. P. testified that he had not worked since June 30, 2019, but he did "a little bit of [unpaid] work [twenty hours a week] helping on . . . [his] father-in-law's farm," such as "chores, tractor chores."  AR40–41.  Mr. P. testified he had been looking for construction work and had applied to "a little over 50 jobs."  AR41.  But Mr. P. testified that he would not be able to perform a job if offered one, due to "[f]atigue, tiredness, needing breaks."  Id.  Mr. P. stated that he is always tired and considered this condition a product of his head injury.  AR42.  Mr. P. discussed having restrictions—"lifting restrictions . . . [n]o ladders. . . . [n]ot to control any work. . . . [s]tick to simple tasks."  Id.

_____

[39] This court notes that the work end date supplied by Mr. P. earlier in the process was February 20, 2019.  See AR246, 251, 335.

36

Mr. P. testified he had thirty head of cattle.  Id.  He testified he had "two kids with [him] at all times.  The two older boys.  The younger two go to daycare three days a week right now.  So [he had] all four Mondays and Fridays."  AR43.  He testified he was able to lift 30 pounds.  Id.  He testified he had a general lack of understanding on how to use computers, aside from using the internet and infrequently sending emails.  AR45–46.  As to his conditions, Mr. P. testified he continued to have "[t]iredness. . . . memory issues. . . . [he] need[ed] to write things down. . . . [he was] very forgetful . . . struggle[d] with multitasking. . . . need[ed] specific directions all the time to stay on task," and was "very moody."  AR49.  Mr. P. stated that this moodiness manifested itself into daily tantrums where he would "snap and throw something or hit something because [he was] frustrated."  Id.  Mr. P. testified that his wife helped him with many activities, but stated he prepared his children's lunches.  AR50.  He testified that though he helped on his father-in-law's farm, it was usually for four hours a day (not every day), and he took ample breaks between tasks.  Id.; AR51.  He testified he was able to drive, not only in the country where he lives, but also in Sioux Falls.  AR52-53.

Next, Dr. David Perry, the vocational expert, testified.  AR53.  Dr. Perry testified that if Mr. P. could only "understand, remember, and carry out short simple instructions," he was unable to perform his previous role as sheet metal foreman, which given Mr. P.'s description of his own job duties, Dr. Perry classified as heavy work.  AR54–55.  Considering only this mental limitation, but no physical limitations, Dr. Perry testified that Mr. P. would be able to

perform farm labor such as what he was doing for his father-in-law, which he categorized as medium work.  Id.  The ALJ requested other examples of work Dr. Perry believed Mr. P. could perform under this hypothetical, to which Dr. Perry replied:

> I'll give you three examples at the medium level.  The first job title is janitor. The DOT number is #381.687-010.  There are approximately 450,000 janitor positions in the [U.S.].  Another example would be the job of a hand packager.  The DOT number is #920.587-018.  The number nationally 220,000.  A third example is the job of a dishwasher.  The DOT number is #318.687-010.  The number of those jobs nationally is about 340,000.

AR55.

Next, the ALJ asked Dr. Perry under a second hypothetical, to keep the mental restrictions of the first hypothetical, but to also preclude positions that require use of "ladders, ropes, or scaffolds."  AR55–56.  Dr. Perry opined that the janitor position would be infeasible, but that hand packager and dishwasher would remain feasible.  AR56.

Dr. Perry was next examined by Mr. P.'s counsel.  AR56.  Dr. Perry was asked whether the jobs aforementioned would be feasible for a person who "would not be able to or would have limited use of the right dominant hand to 50% of the working day because of pain and limited range of motion."  AR57.  Dr. Perry testified that under that hypothetical, none of the jobs aforementioned were feasible.  Id.

Dr. Perry was next asked under any hypothetical previously discussed, given Mr. P.'s alleged propensity for "daily outbursts that are socially inappropriate," whether such outbursts would "be a hindrance to maintaining

38

gainful employment as [Dr. Perry had] outlined." Id.  Dr. Perry replied that
"such an individual would not be employable on a competitive basis." Id.

This was the last testimony, and the hearing concluded.  AR58.

## IV.    The ALJ's Decision

On June 24, 2021, the ALJ released her Notice of Decision - Unfavorable,
stating that Mr. P. "has not been under a disability within the meaning of the
Social Security Act from June 30, 2019, through the date of [the] decision."
AR8, 12, 22.  In coming to that conclusion, the ALJ held that while Mr. P. does
have a "severe impairment: traumatic brain injury (TBI) (20 CFR 404.1520(c)),"
he "does not have an impairment or combination of impairments that meets or
medically equals the severity of one of the listed impairments in 20 CFR Part
404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."
AR13–14.  The ALJ noted that she "specifically considered listing 11.18" and
concluded that Mr. P.'s "impairments do not satisfy the criteria of any listing."
AR14.  The ALJ also held that Mr. P. "has the residual functional capacity . . .
to perform the physical demands of work at all exertional levels, but who is
limited from a mental standpoint as follows:  [Mr. P.] is able to understand,
remember and carry out short, simple instructions."  AR16.  Ultimately, the
ALJ agreed with the vocational expert that Mr. P. could perform in such roles
as janitor, hand packager, and dishwasher, and was therefore "not . . . under a
disability, as defined in the Social Security Act."  AR22.

**V.    Appeal of ALJ Decision**

On July 15, 2021, Mr. P. sought judicial review of the ALJ's decision by filing an unripe complaint in the District of South Dakota, which was ultimately dismissed without prejudice on April 6, 2022.  See Compl., [P.] v. Kijakazi, No. 4:21-cv-04122-KES (D.S.D. July 15, 2021); Order Granting Mot. to Dismiss, [P.] v. Kijakazi, No. 4:21-cv-04122-KES (D.S.D. Apr. 6, 2022).

On June 1, 2022, Mr. P. filed his Brief in Support of Appeal to the Social Security Administration Appeals Council.  AR336–39.  The brief arguments mirror what is before this court: that the ALJ erred when she:

> concluded that Mr. P. did not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments of 20 CFR Part 404, Subpart P, Appendix 1 listing 11.18 . . . [and that] the ALJ erroneously concluded that considering Mr. P.'s age, education, work experience, and residual function capacity, there are significant jobs in the national economy that . . . Mr. P. can perform.

AR337–38.

On July 18, 2022, the SSA Appeals Council denied Mr. P.'s request of review of the ALJ's decision.  The council found that the decision did not meet any criteria under which it would initiate review, which are:

(1)    The Administrative Law Judge appears to have abused his or her discretion.
(2)    There is an error of law.
(3)    The decision is not supported by substantial evidence.
(4)    There is a broad policy or procedural issue that may affect the public interest.

AR1 (numerals added).

40

Because the appeals council denied review of the ALJ's decision, her decision constitutes "the final decision of the Commissioner of Social Security in [Mr. P.'s] case."  Id.

Pursuant to 42 U.S.C. § 405(g), Mr. P. now invokes his right to seek judicial review of the ALJ's unfavorable determination.  Docket No. 17 at p. 2.

## DISCUSSION

### I.   Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by "substantial evidence [i]n the record as a whole."  Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009) (citing Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997)).  "[S]ubstantial evidence [is] defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support [the Commissioner's] conclusion.' " Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action."  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal quotations and citations omitted).  Yet, "[i]n conducting [its] limited and deferential review of the final agency determination under the substantial-evidence standard, [the court] must view the record in the light most favorable to that determination."  Chismarich v. Berryhill, 888 F.3d 978, 980 (8th Cir. 2018).

41

In assessing the substantiality of the evidence, evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Minor, 574 F.3d at 627. The Commissioner's decision may not be reversed "merely because substantial evidence would have supported an opposite decision." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). "[I]f it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings," the Commissioner must be affirmed. Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993) (quoting Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. "Erroneous interpretations of law will be reversed." Walker ex rel. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998) (citation omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311 (finding "appropriate deference" should be given to the SSA's interpretation of the Social Security Act).

## II.    The Disability Determination and the Five-Step Procedure

For a claimant to qualify "for disability insurance benefits, [he] has the burden of establishing the existence of a disability"—as defined by the Social Security Act.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) (citation omitted) (hereinafter "the Act").  As pertinent here, the definition of "disability" under the Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2).

The ALJ applies a five-step procedure to decide whether an applicant is disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520.  The five steps are as follows:

> **Step One**: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b).  If the applicant is engaged in substantial gainful activity, he is not disabled, and the inquiry ends at this step.  Id.

> **Step Two**: Determine whether the applicant has an impairment or combination of impairments that are severe, i.e., whether any of the applicant's impairments or combination of impairments significantly limit her physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments, the applicant is not disabled, and the inquiry ends at this step.  Id.  The regulations prescribe a special procedure for analyzing mental impairments" to determine

whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992) (citing 20 C.F.R. § 404.1520a).

**Step Three**: Determine whether any of the severe impairments identified in step two meets or equals a "listed impairment" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a listed impairment, the applicant will be considered disabled without further inquiry.  Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985).  This is because the regulations recognize the listed impairments as so severe that they prevent a person from pursuing any gainful work.  Heckler v. Campbell, 461 U.S. 458, 460 (1983).  If the applicant's impairment(s) are severe but do not meet or equal a listed impairment, the ALJ must proceed to step four.  A special procedure for mental impairments also applies when determining whether a severe mental impairment meets or equals a listed impairment.  20 C.F.R. § 404.1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work.  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, even those that are not severe, to determine the applicant's residual functional capacity (RFC).  If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled.  20 C.F.R. §§ 404.1520(e)–(f); 404.1545(e).  If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to step five.  20 C.F.R. § 404.1520(f).

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform.  To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience.  20 C.F.R. § 404.1520(g).  If the applicant can "make an adjustment to other work," the applicant is not disabled.  If they cannot, the applicant will be found to be disabled.  Id.

## III.    Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the

five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994);

Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a).  The burden of proof

shifts to the Commissioner at step five.  Nevland v. Apfel, 204 F.3d 853, 857

(8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994). "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting is "a long-standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 n.3 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

## IV.   Assignments of Error

In his opening brief, Mr. P. assigns two errors to the ALJ's unfavorable decision: (1) that "[t]he ALJ erroneously concluded that Mr. P. did not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments of 20 CFR Part 404, Subpart P, Appendix 1 listing 11.18," and (2) that "the ALJ erroneously concluded that considering Mr. P.'s age, education, work experience, and residual function capacity, there are significant jobs in the national economy that Mr. P. can perform." Docket No. 17 at p. 8–9.

Mr. P. makes an additional argument in his reply brief—that his condition meets Listing 1.18. Docket No. 27 at p. 1.

45

**A.    Whether the ALJ's Determination that Mr. P. Does Not Have an Impairment or Combination of Impairments that Meets or Medically Equals the Severity of the Listed Impairments of 20 CFR Part 404, Subpart P, Appendix 1 Listing 11.18 is Supported by Substantial Evidence.**

Mr. P. assigns error because the ALJ did not conclude that Mr. P. suffers from the listed impairment 11.18.  Docket No. 17 at p. 8.  The definition of that listing is as follows:

> **11.18** Traumatic brain injury, characterized by A or B:
>
> **A.**  Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, persisting for at least 3 consecutive months after the injury; or
>
> **B.**  Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), and in one of the following areas of mental functioning, persisting for at least 3 consecutive months after the injury:
> > **1.**  Understanding, remembering, or applying information (see 11.00G3b(i)); or
> > **2.**  Interacting with others (see 11.00G3b(ii)); or
> > **3.**  Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
> > **4.**  Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. Part 404 App. 1 of Subpart P § 11.18 [hereinafter cited as "Listing" followed by the applicable section number].

Mr. P. specifically identifies as satisfying the definition of the listing under B3, characterized by a "marked limitation . . . in physical functioning . . . and in . . . the following area[] of mental functioning[:] . . . [c]oncentrating, persisting, or maintaining pace (see 11.00G3b(iii))."  Docket No. 17 at p. 8; Listing 11.18B3.

46

To qualify under this listing, Mr. P.'s neurological disorder must result in, *inter alia*, a marked limitation in physical functioning.  Listing § 11.00G2.  A marked limitation in physical functioning "means that, due to the signs and symptoms of [the] neurological disorder, [the claimant is] seriously limited in the ability to independently initiate, sustain, and complete work-related physical activities."  Listing § 11.00G2a.

To support such a finding, Mr. P. argues "Dr. McGrath found that Mr. P.'s right hand fine motor dexterity had deteriorated significantly.  These deficits caused problems with tasks requiring gross upper extremity strength.  Dr. McGrath also noted that Mr. P. had some marked difficulty with bilateral upper extremity fine motor skills such as keyboarding."  Docket No. 17 at p. 9.

While this is a semi-accurate restatement of Dr. McGrath's findings, Dr. McGrath considered the "deficits" with Mr. P.'s "right hand [to] likely reflect his injuries to the right wrist."  Docket No. 17-2 at p. 11.  Put another way, Dr. McGrath considered Mr. P.'s wrist injury the likely source of any physical limitation related to Mr. P.'s right hand.  To satisfy the criteria of Listing 11.18, however, any marked limitation to physical functioning must derive from the alleged neurological disorder—not an independent injury such as a wrist fracture.  Listing § 11.00G2a (physical limitation must be "due to the signs and symptoms of the neurological disorder").

Because at least one necessary criterion of the listing is unsatisfied, the record supports the ALJ's finding that Mr. P.'s impairment does not meet the

criteria of Listing 11.18.  <u>Schmitt v. Kijakazi</u>, 27 F.4th 1353, 1359 (8th Cir. 2022) (citation omitted).

**B.     Whether Mr. P. Meets Listing 1.18.**

In Mr. P.'s reply brief, he contends that the Commissioner "ignores that Plaintiff's right wrist injury would otherwise be considered severe per Listing 1.18." Docket No. 26 at p. 1.  That argument was not made in Mr. P.'s opening brief.  <u>See generally</u> Docket No. 17.  Mr. P. only assigned error to the ALJ for not finding his condition met listing 11.18.  <u>Id.</u> at p. 8.  This court will generally not entertain an argument raised for the first time in a reply brief.  <u>Bird v. Mertens-Jones</u>, No. 4:21-CV-04197-KES, 2023 WL 1785572, at *6 (D.S.D. Feb. 6, 2023) (citing <u>Barham v. Reliance Standard Life Ins. Co.</u>, 441 F.3d 581, 584 (8th Cir. 2006)).

But even considering the merits of Mr. P.'s Listing 1.18 argument, no evidence in the record supports it.

Mr. P. argues in his reply brief that he:

> sustained a right scaphoid fracture which was surgically reduced. Following surgery, Plaintiff continuously experiences pain in his right wrist and reduced range of motion.  Further, he must avoid lifting objects over thirty pounds, trauma, shear, and pressure against his wrist. These findings are supported by Dr. Emran Sheikh in his treatment of Plaintiff.

Docket No. 27 at p. 1.

The court first notes that in support of his theory, Mr. P. ignores the recission of his wrist-related restrictions.  It is true that in the early days of Mr. P.'s recovery, Dr. Sheikh instructed Mr. P. to "avoid lifting objects over [a specified number of] pounds, trauma, shear, and pressure against his wrist."

48

Docket No. 27 at p. 1.; AR468, 472, 485.  These restrictions applied between April and August of 2018.  AR468, 472, 485; cf. AR467.  But on August 23, 2018, Dr. Sheikh released Mr. P. "at full duty."  AR467.  Nothing in the record supports the assertion that Mr. P. remains restricted in this way.

The definition of Listing 1.18 is as follows:

**1.18** Abnormality of a major joint(s) in any extremity (see 1.00I), documented by A, B, C, and D:

**A**. Chronic joint pain and stiffness.  AND

**B**. Abnormal motion, instability, or immobility of the affected joint(s). AND

**C**. Anatomical abnormality of the affected joint(s) noted on:
    **1**. Physical examination (for example, subluxation, contracture, or bony or fibrous ankylosis); or
    **2**. Imaging (for example, joint space narrowing, bony destruction, or ankylosis or arthrodesis of the affected joint). AND

**D**. Impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months, and medical documentation of at least one of the following:
    **1**. A documented medical need (see 100C6a) for a walker, bilateral canes, or bilateral crutches (see 100C6d) or a wheeled and seated mobility device involving the use of both hands (see 1.00C6e(i)); or
    **2**. An inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4), and a documented medical need (see 1.00C6a) for a one-handed, hand-held assistive device (see 1.00C6d) that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand (see 1.090C6e(ii)); or
    **3**. An inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4).

Listing 1.18.

Criterion D is dispositive.  No evidence—not even Mr. and Mrs. P.'s statements—suggest that Mr. P. (1) has a "documented need . . . for a walker, bilateral canes, or bilateral crutches . . . or a wheeled and seated mobility device involving the use of both hands."  Listing 1.18D1.  Nor is there any evidence documenting a medical need "for a one-handed, hand-held assistive device . . . that requires the use of the [unaffected] upper extremity or a wheeled and seated mobility device involving the use of one hand."  Listing 1.18D2.  Finally, nothing in the record suggests that Mr. P. has "[a]n inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements."  Listing 1.18D3.

One reason is because the record is bereft of evidence concerning Mr. P.'s left-handed ability.  At step three, it is the claimant's burden "to establish that his or her impairment meets or equals a listing."  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).  "To meet the requirements of a listing, [the claimant] must have a medically determinable impairment(s) that satisfies all of the criteria in the listing."  20 C.F.R. § 404.1525.  This is established through "objective medical evidence from an acceptable medical source"—namely "medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1521.  Here, Mr. P. offers no evidence whatsoever establishing that his

left hand is incapable of independently executing fine and gross movements.[40]

Without such evidence, it becomes a legal impossibility for Mr. P. to prove his

"inability to use *both* upper extremities to the extent that *neither* can be used to

independently initiate, sustain, and complete work-related activities involving

fine and gross movements."  Listing 1.18D3 (emphasis added).  Because he

cannot make that showing, he cannot meet listing 1.18.  KKC v. Colvin, 818

F.3d 364, 370 (8th Cir. 2016) (citation omitted).

> **C.    Whether the ALJ's Determination that Considering Mr. P.'s
>         Age, Education, Work Experience, and Residual Functional
>         Capacity, There Are Jobs that Exist in Significant Numbers in
>         the National Economy that Mr. P. Can Perform is Supported by
>         Substantial Evidence.**

Mr. P. next argues that the ALJ erred by finding that "there are

significant jobs in the national economy that Mr. P. can perform."  Docket No.

17 at p. 9.  Specifically, Mr. P. argues (1) that the three jobs the vocational

expert identified as ones Mr. P. could perform require the "gross upper

extremity strength and dexterity that Mr. P. does not possess," and (2) that

these jobs require the cognitive abilities that Mr. P. does not possess.  Id.  Mr.

P. adds that "[t]his was the conclusion Mr. Thomas Audet reached in his

vocational assessment."  Id.

---

[40] See Listing 1.00E4 ("Fine movements, for the purposes of these listings,
involve use of your wrists, hands, and fingers; such movements include
picking, pinching, manipulating, and fingering.  Gross movements involve use
of your shoulders, upper arms, forearms, and hands; such movements include
handling, gripping, grasping, holding, turning, and reaching.  Gross
movements also include exertional abilities such as lifting, carrying, pushing,
and pulling.  Examples of performing fine and gross movements include, but
are not limited to, taking care of personal hygiene, sorting and handling papers
or files, and placing files in a file cabinet at or above waist level."

### 1.   Whether the ALJ Erred in Failing to Include Physical Impairment in Mr. P.'s RFC.

Mr. P. assigns error to the ALJ for failing to have the vocational expert consider physical limitation at step five.  Id. at p. 9.  Such an argument must presume an RFC that includes physical limitation, because the identification of jobs at step five is dictated by the parameters of the RFC. 20 C.F.R. 404.1520(g).  At step four, the ALJ did not include any physical limitation in Mr. P.'s calculated RFC.  AR16.  Yet, Mr. P. did not challenge that result in his brief.  See Docket No. 17.  Generally, "[c]laims not raised in an opening brief are deemed waived."  Jenkins v. Winter, 540 F.3d 742, 751 (8th Cir. 2008).

Even if this court broadly interprets Mr. P.'s argument as an attack, first on the ALJ's failure to adjust for physical limitation in the RFC, and second on the ALJ's failure to subsequently apply that limitation to job prospects, the court must uphold the ALJ's findings.

"When assessing a claimant's RFC, the ALJ must consider all relevant evidence in the record."  Julin v. Colvin, 826 F.3d 1082, 1089 (8th Cir. 2016) (citation omitted).  "But a claimant's RFC is a medical question, and some medical evidence must support the RFC determination."  Id. (citation omitted).

At the administrative hearing, Mr. P. testified that his wrist had not recovered, that he did not "have movement," and that it "hurts when [he does] things."  AR47–48.  He stated that he is able to lift 30 pounds.  AR43.

Upon reviewing the medical record as a whole, the ALJ concluded that:

As for the claimant's statements about the intensity, persistence, and limiting effects of his symptoms, they are inconsistent because the medical evidence of record shows he has recovered from his injury from a physical standpoint.  His complaints of pain and limited range of motion are not supported by the medical evidence of record.

AR18.

In support of her finding of physical recovery, the ALJ cited: (1) the release by Dr. Puumala, a neurosurgeon, with no restrictions; (2) the release by Dr. Sheikh, the wrist surgeon, "at full duty;" and (3) the visit summary from Mr. P.'s most recent medical appointment, which stated "[a]t this time [Mr. P.] is functional, back to work, and doing activities, although he does get frustrated with his memory limitations."  AR20 (citing AR459, 467, 641); see also id. (citing AR476) ("Authorized to return to work without restrictions.") ("Patient agrees with above plan.").

As stated in Section IV(A), *supra*, Mr. P. places special emphasis on the May 2019 report of Dr. McGrath, which noted some impairment with Mr. P.'s grip strength and "fine motor dexterity."  Docket No. 17 at p. 9; Docket No. 17-2 at p. 11.  But even this report opined that Mr. P. "likely ha[d] recovered to the point where he could function as a 'journeyman,'" and the only restrictions Dr. McGrath suggested were informed by Mr. P.'s cognitive disabilities, not physical ones.  Docket No. 17-2 at p. 12.

As to Mr. P.'s stated lifting restrictions, the ALJ noted that Dr. Ripperda required a 25-pound lifting restriction in his notes from June 6, 2018.  AR20 (citing AR606).  But the ALJ found this to be a temporary restriction.  Id.

Indeed, Dr. Ripperda released Mr. P. to work in December of 2018 with no restrictions to either his hip or wrist.  AR616.

At bottom, this court's "scrutinizing analysis" of the record reveals no evidence to support affixing a physical limitation to Mr. P.'s job prospects. See Scott, 529 F.3d at 821; Docket No. 17 at p. 9.  This court cannot consider Mr. P.'s self-diagnosis as medical evidence.  Kayser v. Caspari, 16 F.3d 280, 281 (8th Cir. 1994).  And while an ALJ must incorporate the "claimant's own descriptions of his limitations" into her RFC calculation, medical evidence must support an RFC determination.  Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003) (citations omitted); Julin, 826 F.3d at 1089.  Substantial evidence supports the ALJ's decision not to impose any physical limitation when determining Mr. P.'s RFC, and this court affirms that decision.  Minor, 574 F.3d at 627.

This court has affirmed the ALJ's decision not to limit Mr. P.'s RFC due to physical impairment.  At step five, it is the RFC that informs the array of jobs a claimant can perform.  Gann v. Berryhill, 864 F.3d 947, 951 (8th Cir. 2017); 20 C.F.R. § 404.1520(a)(4)(v).  It would be error, then, for an ALJ to limit the selection of that array beyond what is dictated by the RFC.  Cf. 20 C.F.R. § 404.1520(g)(1).  Mr. P.'s argument that the ALJ should have asked "the vocational expert [to] consider Mr. P.'s upper extremity deficits and fine motor deficits" cannot survive where the RFC does not command that result.

### 2.   Whether the Jobs Selected at Step Five Require Cognitive Abilities that Mr. P. does not Possess.

Mr. P. also argues that the jobs identified in step five "require the cognitive abilities that Mr. P. does not possess."  Docket No. 17 at p. 9.  As with Section IV(B)(1), *supra*, it does not appear that Mr. P. is challenging the mental limitations calculated at step four.  But, as in Section IV(B)(1), the court will broadly construe the argument as though it first challenges the accuracy of the RFC and proceed accordingly.

In his application for benefits, Mr. P. cited the following mental conditions: "[m]ood swings [and] [d]epression, [m]emory [i]ssues, [and] [s]taying focused and on task."  AR227.  At the administrative hearing, Mr. P. complained of "[f]atigue, tiredness, needing breaks."  AR41.  He stated he is "always tired" and that "things wipe [him] out."  AR42.  In addition to fatigue, Mr. P. cited "[m]emory issues. I need to write things down. I'm very forgetful.  I struggle with multitasking.  I need specific directions all the time to stay on task.  I'm very moody."  AR49.  When asked to elaborate on his moodiness, Mr. P. responded "[j]ust things get me frustrated really easily when, you know, I have little tantrums almost.  Right now I'll snap and throw something or hit something because I'm frustrated."  Id.

At step four, the court finds that the ALJ followed the appropriate procedure under 20 CFR § 404.1520a by "incorporat[ing] the pertinent findings and conclusions" from earlier steps in the application process, which implemented the "special technique" for evaluating mental impairments required by the Act.  AR14–21; 20 C.F.R. 404.1520a(e)(4); see also AR63–65,

70–72.  The ALJ's decision included "a specific finding as to the degree of limitation in each of the functional areas" recognized by the regulations.  AR15-16; 20 C.F.R. 404.1520a(e)(4).  The ALJ concluded by attaching a mental limitation to Mr. P.'s RFC, finding that "[t]he claimant is able to understand, remember and carry out short, simple instructions."  AR16.  As to Mr. P.'s other cognitive complaints, the ALJ noted lack of support for them in the medical record.  AR19.

The court notes that as to Mr. P.'s complaint of mood lability and depression, the medical record conveys that these symptoms were being successfully managed by Mr. P.'s prescription Zoloft.  See AR616 ("As long as he takes his medication on a regular basis many of the symptoms are under okay control."); see also AR621 ("His mood has been doing well with Zoloft.").

As to Mr. P.'s fatigue, to the extent it falls under the umbrella of "cognitive disability," the court notes that in June of 2019, Mr. P. "complain[ed] of fatigue particularly towards the end of the day."  AR625.  Dr. Ripperda considered this, along with other complaints Mr. P. made in June and July of that year, but stuck firm to his recommendation that the only restriction placed on Mr. P.'s job prospects be that they are limited to those "that limit the amount of divided or distracted memory tasks."  AR624–28.

Mr. P.'s mental examination in December of 2019 resulted in "no diagnosis."  AR637.  Later, both state agency psychiatric consultants considered Mr. P.'s cognitive complaints to be inconsistent with the record.  AR64, 71.

56

In sum, the court finds that Mr. P.'s claims that his fatigue or socially inappropriate outbursts are of such magnitude that they prevent him from employment are not supported by medical evidence.  The calculation of an RFC must be supported by some medical evidence.  Julin, 826 F.3d at 1089.  Mr. and Mrs. P.'s statements cannot stand in place of that requirement.  Kayser, 16 F.3d at 281.  Mr. P. cites the COVID crisis as his reason for failing to seek follow-up treatment after February 2020.  AR38.  But the COVID crisis does not provide the court the ability to fortify the record with suppositions.  The record supports limiting Mr. P.'s job prospects to those that require "short, simple instructions," because that is what Dr. Ripperda recommended.  AR16, 628.  Substantial evidence supports the ALJ's decision to only include this mental limitation when calculating Mr. P.'s RFC, and this court affirms that decision.  Minor, 574 F.3d at 627.

Because the court affirms the ALJ's calculation of Mr. P.'s RFC, the only question remaining is whether the jobs the ALJ identified at step five are consistent with that RFC.

At the hearing the ALJ asked the vocational expert, Dr. Perry, to provide jobs under the following hypothetical:

> [P]lease assume an individual of the claimant's younger age, high school education, past work experience as you have described who has the residual functional capacity to perform the physical demands of work but who is limited from a mental standpoint.  The individual is able to understand, remember, and carry out short simple instructions.

AR55.

Dr. Perry noted that Mr. P. could not perform his previous job as sheet metal foreman, but "could do the farm labor work if you consider that to be part of his past work." Id.  The ALJ asked Dr. Perry to identify other jobs, and Dr. Perry provided three examples:  (1) Janitor (DOT # 381.687-018), of which "[t]here are approximately 450,000 . . . positions in the [United States]"; (2) hand packager (DOT # 920.587-018), of which there are 220,000 positions in the United States; and (3) dishwasher (DOT # 318.687-010), of which there are 340,000 positions in the United States.  Id.; see 1991 WL 673258; 1991 WL 687916; 1991 WL 672755.[41]

At step five, if a claimant "cannot do [his] past relevant work," the ALJ determines whether the claimant "can make an adjustment to other work."  20 C.F.R. § 404.1520(g)(1).  The ALJ does so by identifying jobs that "exist in significant numbers in the national economy," while considering the claimant's RFC, and "the vocational factors of age, education, and work experience."  20 C.F.R. § 404.1560(c)(1).  The ALJ is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [his] residual functional capacity and vocational factors."  20 C.F.R. § 404.1560(c)(2).  "A vocational expert's

---

[41] This court notes that "dishwasher" does not exist as either the main title or an alternative title under DOT # 318.687-010 (Kitchen Helper).  But to the extent there is error, it is harmless, because the job duties under this occupation include the acts one undertakes as a dishwasher.  See 1991 WL 672755 ("Washes pots, pans, and trays by hand.  Scrapes food from dirty dishes and washes them by hand or places them in racks or on conveyor to dishwashing machine."); see Benavidez v. Kijakazi, Civ. No. 20-990 SCY, 2021 WL 6062715, at *5 (D.N.M. Dec. 22, 2021) ("[A] 'kitchen helper' may perform 'any combination' of the listed duties.").

testimony may count as [such] substantial evidence." <u>Biestek v. Berryhill</u>, 587 U.S. ___, ___, 139 S. Ct. 1148, 1155 (2019).

This court confirms that the hypothetical presented to Dr. Perry included Mr. P.'s RFC as well as his vocational factors. AR55. Dr. Perry testified that Mr. P. could adjust to an occupation of janitor, hand packager, or dishwasher under those conditions. <u>Id.</u> This testimony amounts to substantial evidence of that ability. <u>Biestek</u>, 587 U.S. at ___, 139 S. Ct. at 1155.

To be sure, the court independently verifies that each occupation suggested by Dr. Perry has a reasoning level corresponding with the mental limitation of Mr. P.'s RFC. Janitor, hand-packager, and kitchen helper are all characterized with a reasoning level of 2. 1991 WL 673258; 1991 WL 687916; 1991 WL 672755. A reasoning level of 2 requires an employee to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions." D.O.T. App. C, 1991 WL 688702. Mr. P.'s RFC limits his job prospects to those that require him to "understand, remember, and carry out short, simple instructions." AR16. This court has previously found a reasoning level of 2 to be consistent with a requirement for short, simple instructions. <u>Flatequal v. Saul</u>, No. 4:19-CV-04045-VLD, 2019 WL 4857584, at *28–29 (D.S.D. Oct. 2, 2019) (citing <u>Moore v. Astrue</u>, 623 F.3d 599, 604 (8th Cir. 2010); <u>Stanton v. Comm'r, SSA</u>, 899 F.3d 555, 558 (8th Cir. 2018)).

Mr. P.'s reference to and reliance on Tom Audet's preliminary vocational evaluation is misplaced. Docket No. 17 at p. 9. The court first notes that the purpose of that evaluation was to determine whether or not Mr. P. could "earn

at or above the two workers compensation rates indicated in the South Dakota Department of Labor files." AR359. That is not a question before this court. See 42 U.S.C. § 405(g). Second, any inference made by Mr. P. that Mr. Audet determined him unable to perform the job of janitor, hand packager, or dishwasher, is an unsupported expansion of Mr. Audet's conclusions. Compare Docket No. 17 at p. 9 with AR359. Even so, Mr. Audet's true conclusions presumed physical restrictions that this court found unsupported by the medical record. See AR359; Section IV(B)(1), *supra.* And because Mr. Audet's vocational findings are not informed by the RFC calculated by the ALJ and affirmed by this court, they can neither inform nor impeach the ALJ's step five decision. See 20 C.F.R. § 404.1560(c)(1)–(2).

Because this court must affirm the ALJ's selection of available jobs at step five if it is supported by substantial evidence, that decision is affirmed. Minor, 574 F.3d at 627.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby ORDERED that the Commissioner's decision is affirmed.

DATED November 7, 2023.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge

60